**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Tucson Embedded Systems Incorporated,

     Plaintiff/Counter-
     Defendant,

v.

Turbine Powered Technology LLC,

     Defendant/Counter-
     Plaintiff.

No. CV-14-01868-TUC-BGM

**AMENDED ORDER**
**(Amended at 3:11 pursuant to stipulation)**

Currently pending before the Court is Plaintiff/Counterdefendant Tucson Embedded Systems, Inc.'s Motion for Partial Summary Judgment Re Arizona Trade Secrets Claim [Counterclaim Count Four] (Doc. 89). Defendant/Counterplaintiff Turbine Powered Technology, LLC filed its Response (Doc. 95) and Supplemental Response (Doc. 117). Plaintiff/Counterdefendant has replied and supplemented as well (Docs. 101 & 123).[1] On March 24, 2016, oral argument was held. Minute Entry 3/24/2016 (Doc. 128).

. . .

--------

[1] The parties' supplemental briefs were properly filed pursuant to this Court's February 11, 2016 Order (Doc. 114).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.       FACTUAL BACKGROUND[2]

### A.     *The Initial Project*

In the fall of 2012, Turbine Powered Technology, LLC ("Turbine" or "TPT") began to develop the concept of building turbine driven generators that would run on field gas for placement at oil and gas wells in remote locations.   First Amended Counterclaim ("Counterclaim") (Doc. 15) at ¶ 5; *see also* Def.'s Controverting and Separate Statement of Facts ("Controverting SSOF") (Doc. 96), McIntyre Decl. (Exh. "A") (Doc. 108) at ¶¶ 4–6 & Grow Decl. (Exh. "E") (Doc. 96-5) at ¶ 7.   Tucson Embedded Systems, Inc. ("TES") was tasked with building the engine control systems to control the turbine engines, called Industrial Digital Engine Controllers ("IDECs"). Counterclaim (Doc. 15) at ¶¶ 7, 9.  Ted McIntyre is the Chief Executive Officer ("CEO") and Manger of Turbine.  McIntyre Aff. 7/25/2014 (Doc. 53-3) at ¶ 1.

On October 3, 2013, TES sent Turbine a proposal dated October 4, 2013.  *Id.* at ¶ 24.  This was not the first proposal exchanged by the parties.  *Id.* at ¶¶ 6–19.   Mr. McIntyre identified the October 4, 2013 Proposal as TPT EMAILS # 000155-159 (Terms and Conditions attachment excluded).  *Id.* at ¶ 24; *see also* Pl.'s Separate Statement of Facts ("SOF") (Doc. 90), TPT EMAILS # 000155-159 (Terms and Conditions attachment excluded) (Exh. "B").  The October 4, 2013 Proposal reflects a total cost of $1,139,600.00; however, the addition is incorrect and the actual total is $1,117,600.00.

---

[2] To the extent that the facts are undisputed, the Court relies primarily on Plaintiff's Statement of Facts.   Where disputes occur, Defendant's objections are either noted or its clarification integrated as appropriate.

McIntyre Aff. 7/25/2014 (Doc. 53-3) at ¶ 26; *see also* Pl.'s SOF (Doc. 90), Exh. "B" at 2. Turbine accepted the payment and delivery schedule set forth in the October 4, 2013 proposal, but did not accept the Terms and Conditions or otherwise alter its previous express rejection of the same.  McIntyre Aff. 7/25/2014 (Doc. 53-3) at ¶¶ 27–28.

TES delivered the IDEC Units 13-24 to TPT.  Pl.'s SOF (Doc. 90), Turbine's Response to Pl.'s RFA (Exh. "C") at ¶ 8.  Turbine asserts that TES delivered the number of IDEC Units described in the October 4, 2013 Proposal, but further asserts that the IDECs did not function as Turbine needed.  McIntyre Decl. 6/1/2015 (Doc. 82-1) at ¶ 27. Turbine accepted the IDEC Units described in the October 4, 2013 Proposal.  Pl.'s SOF (Doc. 90), Exh. "C" at ¶ 9.   Turbine asserts that it has paid $740,894.82 of the $1,117,600.00 agreed to by the parties.  Order 3/11/2015 (Doc. 67) at 10:9–10.

### B.      The Instant Litigation

On February 26, 2014, TES filed this lawsuit alleging, *inter alia*, a breach of contract based on Turbine's alleged failure to pay amounts owed for the IDECs.  *See* Compl. and Jury Trial Demand (Doc. 1).   On March 21, 2014, Turbine filed its counterclaim alleging, *inter alia*, that TES misappropriated Turbine's trade secrets.  *See* Answer and Counterclaim (Doc. 11).

### C.      Turbine's Alleged Trade Secrets

In its First Amended Counterclaim, Turbine alleges that its trade secrets include:

(a) " . . . the use of the T-53 as a driver for a power generator, including obtaining access to the Turbine Power's dyno, equipment, manufacturing and development facilities and Turbine Power's engineers and technicians[;]" and

(b) " . . . the timing temperatures, flow rates, horsepower settings, and pressures at which the T-53 optimally operated, all of which TES learned from Turbine Power and its engines, equipment and people."

Turbine's First Amended Counterclaim (Doc. 15) at ¶¶ 50–51. Turbine "affirmatively alleges that its trade secrets are a compilation consisting of the parameters and settings, including timing, temperatures, flow rates, horsepower settings, pressures, warning protocols, and shutdown protocols, necessary to make a T-53 engine run on field gas drive a one megawatt (1 mw) generator in oil and gas industry applications in remote locations where personnel cannot be constantly on sight monitoring it to prevent catastrophic failures." Def.'s Controverting SSOF (Doc. 96) at ¶ 13; *see also* McIntyre Decl. 9/25/2015 (Doc. 108) at ¶ 11. TES propounded non-uniform interrogatories upon Turbine, one of which sought Turbine to "[d]escribe in detail each and every trade secret TES allegedly misappropriated to support TPT's claims in Count Four of TPT's First Amended Counterclaim." Pl.'s SOF (Doc. 90), Turbine Powered Technology, LLC's Responses to Plaintiff/Counterdefendant's Non-Uniform Interrogatories (Exh. "D") at 6. TPT's response was as follows:

TPT objects to the Interrogatory in that it asks TPT to reveal proprietary, trade secret information without adequate protective measures. Namely, TPT and TES have yet to agree on a form of protective order. Subject to and without waiving the aforementioned objections, TPT responds as follows:

TPT did have trade secrets in the information that was conveyed to TES. Ted McIntyre, unlike anyone else, possessed specific knowledge about controlling T-53 turbine engines for industrial uses. The Honeywell manual TES refers to is a FLIGHT engine manual, not an industrial engine use manual. The specialized knowledge is knowing how to convert an aircraft engine to industrial use (without any manual on that for the T-53 engine). An engine in a helicopter does not operate the same as a generator

producing 1000 Kw of power.  The controls must be configured differently for these very different applications.  Some baselines were the same, but many were different.  TPT did make reasonable efforts to keep these secret, by just telling the TES engineers the set-points at which to perform certain actions.  TPT further sought to keep the trade secrets secret by so stating in every email from TPT's Electrical Manager Jimmie Growe [sic] to David Crowe.  This was more than a reasonable effort to maintain secrecy of the trade secret, as the software was supposed to be owned by TPT.  TPT purchased it for that purpose.  TPT was not paying TES to come train for free at TPT's facility so that TES could then take that trade secret and attempt to sell it to other companies.  If TPT had known that TES would try to steal the trade secrets of how to control a T-53 engine for industrial use, much more effort at secrecy would have been made.  Finally, the circumstances that required TES to protect the secret from disclosure were the ongoing negotiations between TES and TPT as to the nature of their relationship.  TES represented to TPT that TES wanted an exclusive relationship with TPT for the T-53 engine powered generators and wanted to be a partner.  (See TES Motion for Protective Order page 10 lines 11/12 where TES alleges a "Turbine and TES Joint Venture[.]"  TPT at some point declined, and at that point TES really began behaving in bad faith.  Again, at all times in email correspondence between TPT's Electrical Manager and TES personnel, the TPT emails stated that the information contained therein constituted trade secrets and gave the recipient notice of the same.

Pl.'s SOF (Doc. 90), Exh. "D" Interrogatory No. 7 Answer.  In response, Turbine reasserts "that its trade secrets are a compilation consisting of the parameters and settings, including timing, temperatures, flow rates, horsepower settings, pressures, warning protocols, and shutdown protocols, necessary to make a T-53 engine run on field gas drive a one megawatt (1 mw) generator in oil and gas industry applications in remote locations where personnel cannot be constantly on site monitoring it to prevent catastrophic failures.  Def.'s Controverting SSOF (Doc. 96) at ¶ 14; *see also* McIntyre Decl. 9/25/2015 (Doc. 108) at ¶ 11.

. . .

1

2

### D.    *Public Availability*

3

TES asserts that "[t]he 'timing, temperatures, flow rates, horsepower settings, and

4

pressures at which the T-53 optimally operated,' identified in Turbine's Counterclaim is

5

publicly available information."  Pl.'s SOF (Doc. 90), Crowe Aff. (Exh. "E") at ¶ 4.  TPT

6

disagrees, asserting "[u]nlike aviation-engine information, [the specific] information [it

7

uses] is not publicly available information and is known only to TPT due to TPT and Ted

8

McIntyre's extensive experience and experimentation with the T-53 engine."   Def.'s

9

Controverting SSOF (Doc. 96), Exh. "A" at ¶¶ 2–15 & Exh. "E" at ¶¶ 8–15.  In support

10

of its contention, TES cites several documents that it believes demonstrate the public

11

availability of Turbine's purported trade secrets.   First, Turbine's engineer, Thomas

12

Leonard, sent an e-mail to TES with the subject line, "T53 IGV Information out of

13

Training Manual" and an electronic excerpt of the Honeywell T53 Series Intermediate

14

Maintenance Training Manual attached.  Pl.'s SOF (Doc. 90), Leonard E-mail (Exh. "1")

15

TES000976–983.    TES further asserts that the Honeywell Training Manual excerpt

16

contains the optimal settings for the T53 guide vane.   *Id.*, Exh. "1" at TES000982.

17

Second, TES states that the United States Army Aviation Report on the T53 contains

18

relevant specifications, and is further evidence that Turbine's alleged trade secrets are

19

publicly available.[3]  Pl.'s SOF (Doc. 90) at ¶ 18.  Specifically, TES point to "graphs at p.

20

89 and 90 (Figures 52 and 53 that contain the IGV Guide Vane Schedules."  *Id.* at ¶ 19.

21

"These graphs – and other portions of the document – contain the relevant T53

22

performance information that Tom Leonard located and then provided to TES as an input

23

24

25

26

27

28

---

[3] The Court only has the e-mail exchange between counsel regarding this document.

in TES's code." *Id.*   Third, TES proffers "multiple vendors offering the T-53 training manual (and other information such as mechanics' manuals) for as little as $30." *Id.* at ¶ 21.

Turbine asserts that the "Honeywell Training Manual contains information about the appropriate settings for the T-53 engine [and the optimal settings for the T53 guide vane] ***for use in aircraft purposes and using liquid fuel.***"   Def.'s Controverting SSOF (Doc. 96) at ¶¶ 16–17 (emphasis in original), Exh. "A" at ¶ 13, Exh. "E" at ¶ 9.   Turbine further points out that "[t]he settings necessary to power the T-53 engine for use in aircraft purposes and using traditional liquid fuel are not the same as the settings necessary to successfully use a T-53 engine transformed to run on field gas to drive a one megawatt (1 mw) generator in oil and gas industry applications in remote locations where personnel cannot be constantly on site monitoring it to prevent catastrophic failures." *Id.*, Exh. "A" at ¶¶ 6–9, 13–14 & Exh. "E" at ¶¶ 9–15.   Turbine states that the settings referenced in the Honeywell Training Manual were a starting point, not and end point. *Id.*, Exh. "A" at ¶¶ 6–15 & Exh. "E" at ¶¶ 9–15.   Ultimately, the optimal settings were derived through extensive experimentation by Turbine.   *Id.*, Exh. "A" at ¶ 14, Exh. "E" 9–15.   Similarly, Turbine states that "[t]he referenced US Army Aviation Report contains information about the appropriate settings for the T-53 engine ***for use in aircraft purposes and using liquid fuel.***"   Def.'s Controverting SSOF (Doc. 96) at ¶ 18–20 (emphasis in original).   Turbine reasserts the unique nature of the settings required for the T-53 engine in the oil and gas industry applications in which Turbine works.   *Id.*   Finally, while Turbine "agrees that there are publicly available manuals regarding settings for the

T-53 engines[,]" it argues against "the compilation of settings that are its trade secrets [being] reflected in those manuals or any other publicly available source." *Id.* at ¶ 21.

Turbine alleges that "its trade secrets are something other than the publicly available settings for T-53 engines in aircraft applications and affirmatively alleges that its trade secret information, a compilation consisting of the parameters and settings, including timing, temperatures, flow rates, horsepower settings, pressures, warning protocols, and shutdown protocols, necessary to successfully use a T-53 engine transformed to run on field gas to drive a one megawatt (1 mw) generator in oil and gas industry applications in remote locations where personnel cannot be constantly on site monitoring it to prevent catastrophic failures, is fundamentally different from the publicly available information regarding appropriate settings for use in aircraft applications and was discovered by TPT through a process of experimentation." Def.'s Controverting SSOF (Doc. 96) at ¶ 22, Exh. "A" at ¶¶ 2–15, Exh. "E" at ¶¶ 9–15. TES states that Turbine has never identified the compilation or the precise numerical settings it claims are its trade secrets.[4] *See* Pl.'s SOF (Doc. 90), Exh. "D."

**E.    Secrecy Maintenance**

In response to TES's interrogatory requesting details regarding the precautions Turbine took to preserve the secrecy of each alleged trade secret, Turbine stated:

> Each email sent from Jimmie Grow, the electrical manager for TPT, to David Crowe and other employees and representatives of TES contained the following language:  "This document and the information, writing,

---

[4] Turbine argues that it is not under a duty to do so in light of the lack of protective order. Def.'s Controverting SSOF (Doc. 96) at ¶ 23–24.  A protective order was subsequently agreed to by the parties and entered by the Court.  *See* Order 10/9/2015 (Doc. 99).

formula, drawing process, technique and/or data contained herein is the proprietary and intellectual property and/or trade secret of Turbine Powered Technology, LLC and may only be used with the express, written consent of Turbine Powered Technology, LLC." Therefore, TES had express notice that all turbine engine data conveyed via this email source was proprietary, protected, and constituted trade secrets. In violation of that notice, TES misappropriated TPT'S proprietary data and attempted to then charge TPT for the use of its own data, and the source code which TPT co-developed. TES further violated TPT's trade secret rights by misappropriating turbine engine control values for commercialization outside of the TPT project.

Pl.'s SOF (Doc. 90), Exh. "D" NUI No. 8 Response. In addition to this written confidentiality clause, Turbine further asserts that it made efforts to verbally inform vendors "that the information it learns from working with TPT on a turbine project is confidential and proprietary to TPT and is to be used only for the benefit of TPT, limiting access to such information to only those few TPT employees, and fewer vendor employees, who need to know the information to create the final product, and avoiding communicating information about its T-53 trade secrets in written form, most frequently relying on private oral communications." Def.'s Controverting SSOF (Doc. 96), Exh. "A" at ¶ 21. Moreover, Turbine states that despite its inability to agree on or execute a final, written non-disclosure and confidentiality agreement with TES, both parties "understood and agreed that TES would keep TPT's proprietary information confidential and use it only for the purposes of the T-53 project." *Id.*, Exh "A" at ¶ 22. Turbine maintains that it has produced e-mails from Jimmie Grow to Eldon Crom and other TES employees which contain technical information regarding the turbine operations/controls. Def.'s Controverting SSOF (Doc. 96) at ¶ 28. TES counters that such e-mails have not been sufficiently identified as containing trade secrets. Pl.'s SOF (Doc. 90) at ¶ 28.

### F.     Alleged Misappropriation

TES's president, David Crowe, admitted that TES incorporated "the timing, temperatures, flow rates, horsepower settings, and pressures at which the T-53 optimally operated[.]"  Crowe Decl. 5/13/205 (Doc. 79-1) at ¶ 14.  Turbine affirmatively alleges that Mr. Crowe "has consistently and wrongly maintained that those particular settings are the type of settings for the T-53 for aircraft applications."  Def.'s Controverting SSOF (Doc. 96) at ¶ 31.  Turbine did grant TES access to its "dyno, equipment, manufacturing and development facilities and Turbine Power's engineers and technicians" "to produce TPT-owned industrial digital engine controllers for TPT products."  Pl.'s SOF (Doc. 90), Exh. "C" Response to RFA No. 24 & Exh. "D" Response to Interrogatory No. 24 at 16:16–18.  Turbine "does not specifically allege that TES acquired TPT's trade secrets by improper means" as defined by A.R.S. § 44-401(1).  Pl.'s SOF (Doc. 90), Exh. "D" Response to Interrogatory No. 12.  Rather Turbine alleges that TES "disclosed" Turbine's alleged trade secrets as defined in A.R.S. § 44-401(2)(b).  *See id.*, Exh. "D" Response to Interrogatory No. 13.  Turbine further alleges that TES "used" Turbine's alleged trade secrets as described in A.R.S. § 44-401(2)(b).  *See id.*, Exh. "D" Response to Interrogatory No. 14.  In response to TES's request for specific identification of what trade secret information was "disclosed" or "used," as described in A.R.S. § 44-401(2)(b)) and how such information was disclosed and/or used, Turbine stated:

> TPT does allege that TES disclosed and used Turbine's trade secrets without authorization.  TES disclosed and used the trade secrets by misappropriating Turbine's trade secrets for use in TES product offerings to the public.  TES further misrepresented itself as the sole source of the Turbine engine control data as entered into the source code.  TES so

misrepresented to a company named Energy New Technologies International Corporation, LLC ("ENTI"). Any disclosure, marketing, or sale other than to TPT of the source code also represents a disclosure of TPT's trade secrets.

*See* Pl.'s SOF (Doc. 90), Exh. "D" Response to Interrogatory Nos. 13 & 14.

On April 11, 2014, Ted McIntyre sent an e-mail to Terry Dailey with ENTI in response to questions ENTI had "on the frac pumper units" and ENTI's intention to visit the TPT facilities for a face-to-face meeting. Pl.'s SOF (Doc. 90), McIntyre Email to Daily 4/11/2014 (Exh. "H"). McIntyre's e-mail stated as follows:

> Terry,
>
> Don't waste your time making the trip, we've already told you we can supply the TF 40s and the controls will be superior to the current TES system. That's all we intend to say, you can't buy 20 Caterpillar engines today no matter how much money you have. We've been trying to close a deal with ENTI for over a year. We have two other Chinese companies besides ENTI who now want to discuss buying frac equipment. I've agreed to spend the $25K to get the special allowance for the State Department approval for the T-55. Regardless of the outcome we intend to sell equipment in China.

*Id.*, Exh. "H." This e-mail does not reflect a discussion between ENTI and Turbine related to the T-53 engines. *See id.* Turbine's trade secret claim, as alleged, relates to specialized knowledge about the T-53 engine. *See* First Amended Counterclaim (Doc. 15) ¶¶ 43–56; Pl.'s SOF (Doc. 90), Exh. "D" Response to Interrogatory No. 7.

David Crowe stated that "TES has not developed, marketed, or sold any products related to the T-53 engine outside of its work with Turbine." Pl.'s SOF (Doc. 90), Exh. "E" at ¶ 11. He further asserts that "TES will gladly agree to never develop, market, or sell products for industrial use of a T-53 engine[,] . . . [and that] [t]he information

Turbine provided to TES has never been used for any other purpose except to be incorporated into the software for the IDECs developed for Turbine's T-53 engines." *Id.*, Exh. "E" at ¶¶ 12 & 14.  Turbine disagrees.  Turbine asserts that Crowe approached it and "indicated a desire to form a partnership [between TES and] TPT in the turbine generator business[,]" which Turbine declined to do.  Def.'s Controverting SOF (Doc. 96), Exh. "A" at ¶ 23.  Turbine further asserts that "[f]rom this point forward, TPT's relationship with TES deteriorated rapidly[,] with David Crowe stat[ing] that he intended to be TPT's biggest competitor in the turbine generator market." *Id.*, Exh. "A" at ¶¶ 24–25.  Turbine points to TES and Crowe's recently formed entity, Arizona Turbine Technology, Inc. as evidence that they are using the trade secret information they learned from TPT. *Id.*, Exh. "A" at ¶26–28.

Turbine provided the information for the T-53 to TES "for the purpose of [it] being used in the software for the IDECs."  Pl.'s SOF (Doc. 90), Exh. "C" Response to RFA No. 23.

### G.    *Alleged Damages*

TES asserts that Turbine has not produced documents that describe its damages related to TES's alleged violation of Arizona's Trade Secrets Act.  Pl.'s SOF (Doc. 90) at ¶¶ 50–51.  Turbine asserts that it has disclosed the expert opinion of Keegan, Linscott & Kenon, P.C. ("KLK") which indicates that Turbine would be entitled to "a typical royalty rate paid in the Energy Machine/Tool industry is 5% of gross revenue" for their technology utilized by TES.  Def.'s Controverting SSOF (Doc. 96), KLK Analysis 1/16/2015 (Exh. "B") at 2.  Turbine further asserts that it "lost (at a minimum) the sale of

6 frac units, valued at $1,400,000 each for a total of $8,400,000."  Def.'s Controverting SSOF (Doc. 96), Turbine's Eighth Suppl. Discl. Statement (Exh. "C") at ¶ 3(b).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986), "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment.  *Id*.  In order to withstand a motion for summary judgment, the nonmoving party must show "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett* in , 477 U.S. 317, 324 (1986).  Moreover, a "mere scintilla of evidence" does not preclude the entry of summary judgment.  *Anderson*, 477 U.S. at 252.  The United States Supreme Court has also recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

. . .

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   ANALYSIS

TES seeks partial summary judgment as to Turbine's trade secret claim, in part, because Turbine "has failed to sufficiently identify its purported 'trade secrets[.]'"  Pl.'s Mot. for Partial Summ. J. (Doc. 89) at 4.  TES further asserts that even if Turbine does have a protectable trade secret, it has failed to adduce any evidence of misappropriation or damages.  *Id.* at 11–13.

### A.   *Trade Secrets—Generally.*

"To establish a claim for misappropriation of a trade secret, the claimant must first prove a legally protectable trade secret exists."  *Calisi v. Unified Financial Services, LLC*, 232 Ariz. 103, 106, 302 P.3d 628, 631 (Ct. App. 2013).  "Like the majority of states, Arizona has adopted the Uniform Trade Secrets Act ("USTA"), which codifies the basic principles of common-law trade-secret protection, to govern the resolution of trade-secret issues.  *Enterprise Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 148, 3 P.3d 1064, 1068 (Ct. App. 1999) (citations omitted).  Pursuant to the Arizona Trade Secrets Act, a "trade secret" is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[;] [and]
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S.  §  44-401(4).    "Accordingly,  matters  that  are  public  knowledge  are  not

safeguarded as trade secrets." *Ehmke*, 197 Ariz. at 149, 3 P.3d at 1069 (citations omitted). Furthermore, "[a]lthough the subject-matter of a trade secret need not rise to the level of novelty to the degree that it does in patent law, the information must be sufficiently novel such that it is not readily ascertainable to the competitors in an industry." *Id.* (citations omitted). This does not preclude, however, "a combination of elements[,] even though each individual component may be a matter of common knowledge[,]" from amounting to a trade secret. *Id.* (citations omitted).

## B.   *Identification of Trade Secret*

TES argues that Turbine's description of its trade secret as "'specialized knowledge' about 'how to convert an aircraft engine to industrial use'" is insufficient as a matter of law. Pl.'s Mot. for Partial Summ. J. (Doc. 89) at 6. In response, Turbine more specifically identifies its trade secrets as "a compilation consisting of the parameters and settings, including timing, temperatures, flow rates, horsepower settings, pressures, warning protocols, and shutdown protocols, necessary to make a T-53 engine run on field gas drive a one megawatt (1 mw) generator in oil and gas industry applications in remote locations where personnel cannot be constantly on sight monitoring it to prevent catastrophic failures." Def.'s Controverting SSOF (Doc. 96) at ¶ 13; *see also* McIntyre Decl. 9/25/2015 (Doc. 108) at ¶ 11.

"When a party fails to identify its trade secrets with particularity, summary judgment is appropriate." *W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, 872 F.Supp.2d 883, 899 (D. Ariz. 2012) (citing *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1166 (9th Cir. 1998)). In *Imax Corp.*, the manufacturer sought "to protect its

interests in large format motion picture projectors, generally known as 'rolling loop' projectors[.]"   152 F.3d at 1162.   Imax, the manufacturer, sued a competitor alleging "misappropriation of trade secrets and unfair competition."   *Id.* at 1163.   Imax identified the trade secrets embodied in its projector system and allegedly misappropriated as, in relevant part:

> bb. the design of the cam unit, *including every dimension and tolerance that defines or reflects that design;*
>
> * * *
>
> *bd. the manner of operation of the cam unit;*
>
> *be. the manner in which the cam unit is lubricated;*
>
> *bf. the design of the film arms, including every dimension and tolerance that defines or reflects that design*[.]

*Imax Corp.*, 152 F.3d at 1166 (emphasis in original).   The Ninth Circuit Court of Appeals noted that:

> [B]ecause Imax's trade secrets claim involves a sophisticated and highly complex projector system, it is unlikely that the district court or any trier of fact would have expertise in discerning exactly which of the projector system's many "dimensions and tolerances" were trade secrets.   Moreover, CTI could not be expected to prepare its rebuttal to Imax's trade secrets claim without some concrete identification of exactly which "dimensions and tolerances" Imax alleged were incorporated into CTI's own projector system.

*Id.* at 1167.   As such, the court "reject[ed] Imax's contention that use of the catchall phrase 'including every dimension and tolerance that defines or reflects that design' achieved the level of specificity necessary to identify the numerical dimensions and tolerances as trade secrets" and affirmed summary judgment against Imax's misappropriation of trade secrets claim.   *Id.* at 1167, 1170 (citations omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Turbine cites to *Joshua David Mellberg LLC v. Will*, 96 F.Supp.3d 953 (D. Ariz. 2015), in support of its contention that "[a]ll that is required is that the trade secret information as defined [is] sufficient to show that the information has economic value from not being generally known." Turbine's Response (Doc. 95) at 8. Turbine's reliance on *Mellberg* is misplaced. The issue before the *Mellberg* court was a motion to dismiss brought pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure. *See Joshua David Mellberg, LLC*, 96 F.Supp.3d 953. As such, the court was considering what was sufficient to state a claim, not whether a party could survive summary judgment. *See id.*

Turbine also attempts to distinguish *Imax, Corp.* from the instant case, as *Imax* was based upon California law. Turbine highlights Section 2019.210, California Civil Code, which requires "before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity[.]" Turbine states that Arizona law does not have this particular requirement. Turbine is correct that the Arizona statute does not contain the same section; however, the same issue arises in the context of discovery, especially where courts have recognized as a matter of policy that "requiring the plaintiff to sufficiently identify its trade secrets prior to allowing discovery on the defendant's trade secrets helps the court to determine the outer permissible bounds of discovery and prevents needless exposure of the defendant's trade secrets." *BioD, LLC v. Amnio Tech., LLC*, No. 2:13-CV-1670-HRH, 2014 WL 3864658 (D. Ariz. Aug. 6, 2014). In the context of such a discovery dispute, the court in *BioD, LLC* observed:

Plaintiffs cannot claim that a method or process is a trade secret without identifying the steps in the process and explaining how those steps make their method or process unique. *See Switch Commc'n Group v. Ballard,* Case No. 2:11–cv–00285–KJD–GWF, 2012 WL 2342929, at *5 (D.Nev. June 19, 2012) ("In order to meet its burden of describing its alleged trade secrets with reasonable particularity," for purposes of discovery, "Switch must specifically describe what particular combination of components renders each of its designs novel or unique, how the components are combined, and how they operate in unique combination"). Plaintiffs must explain how the combination of much of what appears to be generally known information can constitute a trade secret. It is simply not sufficient for plaintiffs to identify a trade secret as a "method" without some explanation of why that "method" could be considered a legally protectable trade secret. Plaintiffs must provide some basis for their contention that their methods and processes are unique and thus legally protectable. Contrary to their contention, plaintiffs are not being asked to prove their trade secret claim prior to being able to take discovery. But, they must provide enough detail about their alleged trade secrets to at least suggest that the alleged trade secrets might be legally protectable. To date, they have not done so. In short, plaintiffs must identify their trade secrets with more specificity than they have done so far.

*Id.* at *6.

Here, Turbine discusses retrofitting the original fuel system; modifying operational and control parameters including the use of BASLER equipment; modifying manifold and nozzle designs; and modifying starting, warning, and shutdown protocols as necessary changes to the T-53 for its purposes and that this information is Turbine's protectable trade secret. *See* Def's Controverting SSOF, Exh. "A" at ¶¶ 5, 8 & 9, Exh. "E" at ¶¶ 7, 10, 11, 12, 13, 14; Def.s' Suppl. Opp. (Doc. 117) Greene Decl. (Exh. "A") at ¶ 7. Based upon the evidence put forth by Turbine, it would appear that it has invested significant time and resources to develop the T-53 for oil and gas industry applications; however, Turbine has failed to provide enough detail about the alleged trade secrets for

TES or this Court to adequately discern what might be legally protectable.[5]  Because the Court finds that Turbine has not met its burden to prove a legally protectable trade secret exists, partial summary judgment in favor of TES is appropriate.

### C.     TES's Remaining Arguments Regarding Trade Secrets

In light of the Court's evaluation regarding Turbine's identification of its legally protectable trade secrets, the Court declines to reach TES's other arguments.

### D.     Attorneys' Fees

TES seeks attorneys' fees because it asserts that "Turbine lacked a good faith, reasonable basis to sue TES for trade secret violations."  Pl.'s Mot. for Partial Summ. J. (Doc. 89) at 14.  The Court disagrees with TES's assessment.  The Court finds that Turbine did not bring this claim in bad faith, and as such, TES is not entitled to an award of attorneys' fees.  *See Universal Engraving, Inc. v. Metal Magic, Inc.*, 602 Fed.Appx. 367, 370 (9th Cir. 2015).

. . .

. . .

. . .

. . .

. . .

. . .

. . .

---

[5] The Court acknowledges that Mr. Greene sets forth Turbine's purported trade secrets in a spreadsheet attached to his declaration; however, any potential secret is embedded in software code and as such its identity is undecipherable.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.     CONCLUSION

For the reasons discussed, *supra*, Plaintiff/Counterdefendant Tucson Embedded Systems, Inc.'s Motion for Partial Summary Judgment Re Arizona Trade Secrets Claim [Counterclaim Count Four] (Doc. 89) is GRANTED.

Dated this 8th day of April, 2016.

Honorable Bruce G. Macdonald
United States Magistrate Judge